UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

EDWARD A. TAYLOR,

                              Plaintiff,

v.

NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

                              Defendant.
———————————————————————

**REPORT AND
RECOMMENDATION**

15-CV-403A

## INTRODUCTION

Before the court are the parties' cross-motions for judgement on the pleadings [10, 17] which were referred to me for preparation of a Report and Recommendation [11].[2] For the reasons stated below, I recommend that this case be remanded to the Acting Commissioner for further proceedings.

## BACKGROUND

Plaintiff filed an application for Social Security Supplemental Security Income ("SSI") on November 8, 2011(T. 141).[3] His initial application was denied, and an administrative hearing was subsequently held before Administrative Law Judge ("ALJ") William Weir on April 19, 2013 (T. 32). On December 3, 2013, ALJ Weir determined that plaintiff was not disabled (T.

---

[1]    Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2]    Bracketed references are to the CM/ECF docket entries.

[3]    References denoted as "T" are to the transcript of the administrative record.

9-24). The Appeals Council denied plaintiff's request for review on March 13, 2015, making the ALJ's determination the final decision of the Acting Commissioner (T. 1-4). Plaintiff thereafter commenced this action.

The record reflects that plaintiff has been treated by Dr. Richard Wolin for his mental impairments since May 24, 2011 (T. 333). Dr. Wolin noted that although plaintiff obtained a degree in medical engineering technology from Buffalo State University College ("Buffalo State"), he could not find employment because he "could not spell". Id.[4] He also noted that plaintiff had already been receiving treatment for his psychological issues from the Dale Association and Horizon Health "for several years". Id.[5]

Upon examination, Dr. Wolin found plaintiff to demonstrate a tangential thought process, mood lability, constrictive affective range, and slightly agitated psychomotor activity (T. 333-34). He used a Hirschfeld Mood Disorder Questionnaire tool which revealed a 73% likelihood of bipolar diathesis[6] (T. 334). Further diagnostic questioning revealed symptoms of mania including: increased physical and/or mental activity or energy, heightened mood, exaggerated optimism and self-confidence, excessive irritability, aggressive behavior, ambitious or grandiose plans or an inflated sense of self-importance, increased and more rapid speech than normal, more thoughts than normal, racing thoughts, impulsiveness, poor judgment, distractibility, and reckless behavior. Id. Depressive symptoms including prolonged sadness, unexplained crying spells, significant changes in appetite and sleep pattern, irritability, anger,

---

[4]   The record reflects that plaintiff suffered from a learning disability for which accommodations were made while he was at Buffalo State (T. 34). Plaintiff testified that he had three short-term jobs in the 15 years prior to the administrative hearing "but was unable to get along with the people I worked with and supervisory people over me" (T. 36).

[5]   Plaintiff testified that he started receiving mental health treatment in 1983 and that he has had "continuous" treatment since that time (T. 40).

[6]   According to Stedman's Medical Dictionary (28th Edition, 2006), diathesis is the constitutional or inborn state disposing to a disease, group of diseases, or metabolic or structural anomaly.

worry, anxiety, pessimism, indifference, loss of energy and persistent lethargy, feelings of guilt and worthlessness, inability to concentrate and indecisiveness, inability to take pleasure from former interests, social withdrawal, and unexplained aches or pains were also demonstrated. Id.

Dr. Wolin diagnosed plaintiff as suffering from bipolar disorder, possible attention deficit hyperactivity, subsyndromal generalized anxiety, and possible learning disability (T. 334). Dr. Wolin assessed plaintiff's Global Assessment of Functioning ("GAF") to be "45 to 50" at that time.[7] Id. He concluded that plaintiff "presents with a most complex clinical picture". Id. Dr. Wolin continued plaintiff on Seroquel, but also wanted to consider a referral for cognitive remediation. Id. In addition, he stated that plaintiff "likely ha[d] a long standing bipolar disorder never formally diagnosed" and may benefit from a mood stabilizer and possibly a psychomotor stimulant. Id.

Dr. Wolin saw plaintiff on 14 occasions between 2011 and 2013, generally recording findings and diagnoses consistent with those stated in his May 24, 2011 report (T. 324, 326, 328, 330, 332, 341, 396, 423, 425, 427, 429, 496) and continually assessing plaintiff's GAF to be between 45 and 50 on each occasion (T. 325, 326, 331, 332, 334, 341, 395, 424, 426, 428, 429, 495 and 497), except one time when he placed plaintiff's GAF at 50 to 55 (T. 492).[8] The last two GAF assessments in the record, by Nurse Practitioner ("NP") Sharon Yager at Horizon Health on January 15, 2013 and February 26, 2013, placed plaintiff's GAF at 30 (T. 482, 488).[9]

---

[7]  The GAF scale found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-4"), published by the American Psychiatric Association, states that a score between 41 and 50 reflects: "[s]erious symptoms (e.g. Suicidal ideation, severe obsessional rituals, frequent shoplifting ) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job) ". DSM-4, p. 34.

[8]   In his December 3, 2012 report making this assessment, Dr. Wolin noted that plaintiff had just completed a "three week stay in the partial hospitalization unit at Buffalo General Hospital" and was on new medications (T. 492).

[9]   A GAF score between 21 and 30 reflects that "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately,

Plaintiff was arrested for shoplifting in June 2012 (T. 51). Subsequently, he was hospitalized on various occasions in the fall of 2012 after developing an addiction to benzodiazepines. On August 25, 2012, plaintiff was seen at the Erie County Medical Center ("ECMC") emergency room for detoxification relating to the alleged abuse of "his scripts" for Klonopin and Xanax (T. 514). He was discharged with instruction to follow up with his doctor (T. 513).

He was seen again at ECMC on August 30, 2012, this time being admitted for Xanax dependence (T. 507). He reported that he had been using Xanax for 10 years and noticed that he began taking too many two weeks earlier after being arrested for shoplifting. Id.  It was noted that plaintiff had been prescribed Klonopin by one doctor and Xanax by a different doctor, and was having the two prescriptions filled at two different pharmacies. Id.  He was discharged on September 1, 2012 with instructions to "only take mediation exactly as prescribed" and to "stop Klonopin and Xanax" (T. 510).

In a report dated September 4, 2012, Dr. Wolin noted that, in connection with his shoplifting arrest, plaintiff had been referred to the court's chemical dependency program and directed to stop taking Xanax (T. 496). Nevertheless, Dr. Wolin advised plaintiff that it was unlikely he would find a substitute for Xanax, and that plaintiff "is going to have to tell the judge that at this particular point, he cannot function off of alprazolam". Id. [10]

On September 10, 2012, plaintiff was again admitted to ECMC due to an "altered mental status" (T. 501). Dr. Mark Fisher noted that plaintiff had left against medical advice on September 1, 2012 and that he was back because "his cousin found him and thought he was

suicidal occupation) OR inability to function in almost all areas (e.g. stays in bed all day; no job, home, friends)". DSM-4, p. 34.

[10]   Alprazolam is the generic for Xanax. Physician's Desk Reference (71st Edition), 2017, p. S-981.

losing his mind". <u>Id.</u>  Dr. Fisher stated that plaintiff was under a mandate from the courts to stop

taking benzodiazepines, like Xanax, but "does not and has not fully understood the severity of

his abuse". <u>Id.</u>  He noted that "[m]uch of the time he has spent here has been justifying his need

for Xanax and medicines to help calm him down". <u>Id.</u>  Although Dr. Fisher noted that Dr. Wolin

was plaintiff's treating psychiatrist, the report does not reflect whether Dr. Fisher was aware of

Dr. Wolin's September 4, 2012 advice to plaintiff regarding his need to continue using Xanax

notwithstanding the instruction to the contrary by the state court judge. Dr. Fisher discharged

plaintiff on September 13, 2012 with instructions to follow up with his treating physicians (T.

503).

      Plaintiff saw Dr. Wolin again on September 18, 2012 (T. 494). At that time, Dr.

Wolin directed plaintiff to "taper" off the use of Xanax over a three week period. <u>Id.</u>  He added

Seroquel XR to plaintiff's regimen of Seroquel "to try to help with anxiety associated with the

discontinuation of the Xanax". <u>Id.</u>  He started plaintiff on doxepin, but "unfortunately" had to

discontinue plaintiff from taking dexmethylphenidate[11]  because "he was too agitated when he is

not on the Xanax". <u>Id.</u>

      Plaintiff was again admitted to ECMC on September 20, 2012 (T. 504). The

admitting diagnosis was "benzo withdrawal" and the diagnosis upon his discharge on September

25, 2012 was "antisocial personality disorder, anxiety attack, pseudoseizures x5". <u>Id.</u>  Hospital

records state that was taken to ECMC "after episodes of bizarre behavior", and claiming that he

had a seizure while in court. <u>Id.</u>  Plaintiff stated that two days earlier he had taken eight Xanax

pills to help him sleep. <u>Id.</u> He also stated that he feels like his throat is going to close while he is

sleeping, he has dreams that he is going to be twisted into weird positions, and that his "blood

---

[11]    Dexmehtylphenidate is the generic for Focalin, a drug used to control Attention Deficit Hyperactivity Disorder.
<u>Physician's Desk Reference</u> (71st Edition), 2017, p. S-367.

brain barrier is going to be penetrated" (T. 505). Plaintiff was placed on Quetiapine[12], Gabapentin and Ativan, and "adjusted quite well" (T. 506). The discharge report included a note that plaintiff was manipulative and that he requested to stay in the hospital longer but was denied. Id.[13]

Apparently it was subsequently determined that plaintiff *could* benefit from additional treatment in a hospital setting, and from October 9, 2012 through October 26, 2012, plaintiff was admitted to a three-week "partial hospitalization program" at Buffalo General Hospital for stabilization and medication management to help him stop using benzodiazepines (T. 548). During this program, plaintiff was in the hospital from 9:00 a.m. until 3:30 p.m. each day (T. 41). Hospital records listed "depression and anxiety, need to build coping skills and medication management to get off benzos" as his presenting problems. Id. Plaintiff was described as an active participant in the program who "struggled" with the idea that he had a problem with benzodiazepines. Id. There was no evidence of any substance abuse during his treatment. Id. He completed the program and was discharged to follow up with his counselor and psychiatrist (T. 549). Upon the termination of the program, his GAF was assessed at 40 (T. 548).[14]

A report from Horizon Health dated January 15, 2013 stated that plaintiff was on a regimen of "Lithium/Seroquel" and was "stable" but reported experiencing a panic attack four

---

[12]   Quetiapine is generic for Seroquel, an anti-psychotic. Physician's Desk Reference (71st Edition), 2017, p. S-806.

[13]   The Acting Commissioner acknowledges that plaintiff's "benzodiazepine abuse" was for an isolated period of short duration. Acting Commissioner's Memorandum of Law [17-1], p. 11.

[14]   A GAF score between 31 and 40 reflects that "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgement, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)". DSM-4, p. 34.

months earlier (T. 489).  His GAF was assessed at 30 (T. 488).  A Horizon Health report dated February 26, 2013 reflects that plaintiff "sometimes has been feeling he can't breathe in his sleep and needs to wake up – this is despite him wearing his cpap. . . . He states he has trouble eating well because he can't afford quality food, and his blood sugars have been high. He denies mania and risky behavior – states he is less fearless. Denies [suicidal ideations], but is very very bored because no one visits him and he can't go anywhere" (T. 485). He was referred for a sleep study (T. 486) and his GAF was again assessed at 30 (T. 482).

Plaintiff alleges that he has been disabled since July 1, 2007 (T. 141), due to a combination of impairments including bipolar disorder, depression, anxiety, sleep apnea, diabetes, dyslexia, arthritis, chronic fatigue, and insomnia (T. 164). ALJ Weir determined that although plaintiff's bipolar disorder and learning disability constituted severe impairments (T. 14), plaintiff could perform a full range of work at all exertional levels with certain nonexertional limitations (T. 17).[15]

## ANALYSIS

### A.  Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error". Shaw v. Chater, 221 F.3d 126, 131 (2d. Cir. 2000) (*quoting* 42 U.S.C. §405(g)).  Substantial evidence is that which a "reasonable mind might accept as

---

[15]   ALJ Weir stated that plaintiff "has the ability to understand, remember and carry out simple instructions, make judgment on simple work-related decisions and respond to usual work situations and changes in a routine work setting. However, [plaintiff] can tolerate only occasional interaction with supervisors, coworkers and the public" (T. 17).

adequate to support a conclusion". <u>Consolidated Edison Co. of New York. Inc. v. NLRB</u>, 305

U.S. 197, 229 (1938).

        For purposes of entitlement to disability insurance benefits, a person is considered

disabled when he or she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months".  42 U.S.C. §§423(d)(1)(A) & 1382c(a)(3)(A). Such a disability will be found to exist

only if an individual's "physical or mental impairment or impairments are of such severity that

[he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her]

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy . . . ." 42 U.S.C. §§423(d)(2)(A) & 1382c(a)(3)(B).

        In order to determine whether plaintiff is suffering from a disability, the following

five-step inquiry must be employed:

"1.     The Commissioner considers whether the claimant
is currently engaged in substantial gainful activity.

 2.     If not, the Commissioner considers whether the claimant has a
'severe impairment' which limits his or her  mental or physical
ability to do basic work activities.

3.     If the claimant has a 'severe impairment,' the Commissioner must
ask whether, based solely on medical evidence, claimant has an
impairment listed in Appendix 1 of the regulations.  If the claimant
has one of these enumerated impairments, the Commissioner will
automatically consider him disabled, without considering
vocational factors such as age, education, and work  experience.

4.     If the impairment is not 'listed' in the regulations, the
Commissioner then asks whether, despite the claimant's severe
impairment, he or she has residual functional capacity to perform
his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform."

Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. See Talavera v. Astrue, 697 F.3d 145 (2d. Cir. 2012); 20 C.F.R. §§404.1520, 416.920. Moreover, the ALJ has an affirmative duty to fully develop the record where deficiencies exist. See Gold v. Secretary, 463 F.2d 38, 43 (2d. Cir. 1972); Swiantek v. Acting Commissioner of Social Security, 588 Fed. Appx. 82, 84 (2d. Cir. 2015) (Summary Order).

If a claimant has a mental impairment, the ALJ must employ the "special technique" identified in 20 C.F.R. §404.1520a to evaluate the claimant's symptoms and rate the degree of functional limitation resulting from the impairment. 20 C.F.R. §404.1520a(b). In doing so, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how a claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. §404.1520a(c).  The ALJ must rate a claimant's degree of limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3).[16]

With respect to assessing limitations in the first three functional areas, a five point scale is used: none, mild, moderate, marked, and extreme. In the fourth functional area, a four point scale is used: none, one or two, three, four or more. 20 C.F.R. §404.1520a(c)(4).  To satisfy the "Paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social

---

[16]   These functional areas are also listed in §12.04B of the Appendix 1 listings and are referred to as the "paragraph B criteria."

functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis". 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C). "Repeated" episodes of decompensation means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration" which are determined, in an exercise of judgment, to be "of equal severity". Id., §12.00(C)(4). *See also* Roach v. Colvin, 2013 WL 5464748, *8 (N.D.N.Y.  2013).

Where the ALJ determines that the claimant has a severe mental impairment, the ALJ must determine whether that impairment meets or equals a mental disorder listed in Appendix 1. 20 C.F.R. §404.1520a(d)(2). Mental impairments are addressed at §12.01 et seq. of the Appendix 1 listings. If the mental impairment is severe but does not meet or equal the Appendix 1 listing, the ALJ must consider any limitations resulting from the impairment when making a residual functional capacity assessment. 20 C.F.R. §404.1520a(d)(3).  When the plaintiff's impairment is mental, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work".  *See* Social Security Ruling 82-62 (1982); Farrill v. Astrue, 486 Fed. App'x 711, 712 (10th Cir. 2012).

**B.  Treating Physician Doctrine**

Plaintiff argues that ALJ Weir failed to properly evaluate the opinions of plaintiff's treating physicians and did not properly interpret the report from a consultative physician. Plaintiff's Memorandum of Law [10-1], p. 17.  More particularly, plaintiff asserts that ALJ Weir failed to properly consider the fact that Dr. Wolin and other treating medical providers had diagnosed plaintiff with ADHD, generalized anxiety disorder, and personality disorder, and had consistently assessed his GAF at 50 or below. Id., pp. 18-22.

The "treating physician rule" directs the Acting Commissioner to give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence. Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004) (*per curiam*); 20 C.F.R. §404.1527(c)(2). When an ALJ discredits the opinion of a treating physician, the regulations direct the ALJ to "always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion". 20 C.F.R. §404.1527(c)(2); Snell, 177 F.3d at 134.

The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. Halloran, 362 F.3d 28, 32; *see also* 20 C.F.R. §§404.1527(c)(1)-(6).  Courts should not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion". Halloran, 362 F.3d at 33.

Here, in addition to depression and bipolar disorder (*i.e.* T. 241, 278, 282, 324, 326, 328, 330), Dr. Wolin and other treating medical providers diagnosed plaintiff as suffering from anxiety (*i.e.* T. 228, 230, 234, 236, 240, 326, 328, 404), ADHD (*i.e.* T. 482, 488) and personality disorder (*i.e.* T. 504, 520). However, ALJ Weir, without any discussion, did not identify these conditions as constituting severe impairments (T. 14).

Without citing any specific example relating to plaintiff's ability to function in a work setting, ALJ Weir concluded that the "medical evidence shows rather mild to moderate clinical abnormalities and that [plaintiff] is able to function relatively well, especially when he is compliant with treatment and is not abusing benzodiazepine medication" (T. 18).[17] He subsequently discussed plaintiff's "unhappiness" with the fact that a prior application for disability benefits was denied and plaintiff's expressed desire to obtain disability benefits (T. 18). While ALJ Weir noted that Dr. Wolin had assessed plaintiff's GAF at 45 to 50, and acknowledged the examples of functional limitations associated with such an assessment (T. 19), he did not discuss the significance of such an assessment with respect to plaintiff's functionality.

Despite acknowledging that plaintiff's dependence upon benzodiazepines was a short term issue lasting only a few months in the fall of 2012, ALJ Weir's decision emphasized this episode (T. 20-21). He also concluded that plaintiff's mental status was "stable", particularly when compliant with his medications (T. 21). ALJ Weir noted that no mental health provider offered a mental functional capacity opinion as to plaintiff's general disability status

---

[17]    ALJ Weir did note that plaintiff lived alone, cared for pet birds, was able to clean and do laundry, prepare meals and use public transportation (T. 17). He also noted that plaintiff communicates with a cousin in California, watches television, and uses a computer (T. 18). The performance of basic activities of daily living, such as these, does not disqualify a person from being disabled under the Social Security Act. Niles v. Astrue, 32 F. Supp. 3d 273, 287 (N.D.N.Y. 2012). It is well-settled that "such activities do not by themselves contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves". Niles, 32 F. Supp.3d at 287; *see also* Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir.1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act").

"other than GAF scores ranging from 50 to 55 when [plaintiff] is compliant with treatment" (T. 22).

However, the record indicates that plaintiff's GAF was consistently assessed below 50 to 55 even when he was compliant with his medications. Prior to August of 2012, there is no evidence in the record that plaintiff was not compliant with his medications. Indeed, Dr. Wolin repeatedly found that "[t]here was no problem with medication adherence" both prior to and subsequent to, the brief time plaintiff abused benzodiazepines in the fall of 2012 (T. 324, 326, 328, 423, 425, 492).[18] Notwithstanding adherence to this medication regimen, from April 20, 2011 through April 2, 2012, Dr. Wolin assessed plaintiff's GAF at 45 to 50, which would suggest serious limitations in occupational functioning. DSM-4, p.34. In the period subsequent to plaintiff's benzodiazepine dependence, again without any indication that plaintiff was non-compliant with his medications, the last two GAF assessments dated January 15, 2013 (T. 488) and February 26, 2013 (T. 482) placed plaintiff's GAF at 30, which would suggest even greater functional limitations.[19] ALJ Weir does not account for these findings.[20]

[18]  ALJ Weir asserts (T. 21) that plaintiff has been non-compliant with his medication because a January 15, 2013 report stated that plaintiff "forgets an occasional lithium dose" (T. 490). This isolated reference does not suggest that plaintiff was purposely failing to take the medication or that he was missing sufficient doses of lithium such that it interfered with his treatment. ALJ Weir's conclusion that plaintiff's functioning would improve if he did not miss "the occasional" dose is not based upon any medical statement in the record, but appears to be an improper medical opinion rendered by ALJ Weir.

[19]  The Acting Commissioner argues that the DSM no longer uses the GAF scale. Acting Commissioner's Memorandum of Law [17-1], p. 13. While the DSM-5, published in 2013, replaced the GAF with the World Health Organization Disability Assessment Schedule ("WHODAS") [DSM-5, p. 16], the GAF was the functional assessment scale used by medical providers treating plaintiff during the time periods involved in this case. The fact that a new scale was adopted does not render all prior assessments under the GAF scale invalid.

[20] The Acting Commissioner also cites authority stating that a failure to consider a GAF score does not mandate remand. Acting Commissioner's Memorandum of Law [17-1], p. 13. While remand is not required in every case in which an ALJ fails to properly address the significance of the GAF scores in the record, here, in light of the fact that the record does not include any express residual functional capacity evaluation, it was incumbent upon ALJ Weir to address the GAF scores which represented plaintiff's treating physician's assessment of his functional capacity. In any event, ALJ Weir's decision was expressly based, at least in part, upon his inaccurate interpretation that plaintiff's GAF was generally assessed at 50 to 55 when he was compliant upon his medication. The record in this

ALJ Weir's focus on the fact that plaintiff's mental status was described as "stable" is also misplaced, particularly in light of the fact that notwithstanding the use of that term, Dr. Wolin and plaintiff's other mental health providers consistently assessed his GAF at levels which would suggest serious functional limitations in the work setting (T. 331, 334, 341, 395, 429, 488, 482).  The fact that plaintiff was described as "stable" did not mean that he no longer suffered from limitations associated with bipolar disorder, ADHD or the other diagnosed mental impairments. *See* Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir. 2008) (stating that the ALJ had a "tendency to overlook or mischaracterize relevant evidence," and that the ALJ "consistently interpret[ed] reports that [the claimant's] condition has been 'stable' to mean that [her] condition has been good, when the term could mean only that her condition has not changed"); Hemminger v. Astrue, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008) ("[T]he fact that other physicians who examined or treated plaintiff … used the word "stable" to describe her fibromyalgia says nothing about whether plaintiff can work: a person can have a condition that is both "stable" and disabling at the same time").

Plaintiff also argues that ALJ Weir erred by giving significant weight to selective portions of the consultative report by Dr. Susan Santarpia (T. 378). Dr. Santarpia found that plaintiff was able to follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, perform complex tasks independently and make appropriate decisions "all within normal limits" (T. 381). At the same time, Dr. Santarpia's concluded that that the results of her evaluation "appear to be consistent with psychiatric problems that may acutely interfere with the [plaintiff's] ability to function on a daily basis". Id. Plaintiff asserts that ALJ Weir's interpretation of Dr. Santarpia's report as stating that

---

case does not support such a conclusion and requires remand for the proper consideration of plaintiff's longitudinal GAF scores.

plaintiff had "no significant mental limitations" (T. 22) is not accurate. I agree. Absent some

explanation as to how plaintiff's psychiatric problems may "acutely" interfere with his ability to

"function on a daily basis" but would not be suggestive of  "significant mental limitations" and

would not interfere with his ability to perform substantial gainful activity on a sustained basis,

reliance upon Dr. Santarpia's opinion does not constitute substantial evidence.

For the reasons stated above, ALJ Weir's decision is not based upon substantial

evidence. This case should be remanded for proper consideration of the full scope of plaintiff's

mental impairments, and the entirety of the evidence presented by plaintiff's treating physicians

assessing his functional ability.


## C.  Credibility

Plaintiff also argues that ALJ Weir failed to properly assess his credibility.

Plaintiff's Memorandum of Law [10-1], p. 22.

An ALJ must consider all of the evidence in record, including statements the

claimant or others make about his or her impairments, restrictions, daily activities, efforts to

work, or any other relevant statements the claimant makes to medical sources during the course

of examination or treatment, or to the agency during interviews, on applications, in letters, and in

testimony during administrative proceedings. Genier v. Astrue, 606 F.3d 46, 49 (2nd Cir. 2010)

(*citing* 20 C. F.R. §404.1512(b)(3)). SSR 96–7p includes a two-part inquiry for evaluating a

plaintiff's contentions of pain and their symptoms: (1) there must be a determination whether the

underlying medically determinable physical or mental impairments could reasonably be expected

to produce the individual's pain or other symptoms; and (2) if such underlying impairments are

found to exist, it must be determined make a finding as to the credibility of the individual's

statements regarding the intensity, persistence, and limiting effects of the symptoms. With regard

to this second step, the regulation states:

> "Second, once an underlying physical or mental impairment(s) that could
> reasonably be expected to produce the individual's pain or other symptoms has
> been shown, the adjudicator must evaluate the intensity, persistence, and limiting
> effects of the individual's symptoms to determine the extent to which the
> symptoms limit the individual's ability to do basic work activities. For this
> purpose, whenever the individual's statements about the intensity, persistence, or
> functionally limiting effects of pain or other symptoms are not substantiated by
> objective medical evidence, the adjudicator must make a finding on the
> credibility of the individual's statements based on a consideration of the entire
> case record. This includes the medical signs and laboratory findings, the
> individual's own statements about the symptoms, any statements and other
> information provided by treating or examining physicians or psychologists and
> other persons about the symptoms and how they affect the individual, and any
> other relevant evidence in the case record. . . . These provisions of the
> regulations provide that an individual's symptoms, including pain, will be
> determined to diminish the individual's capacity for basic work activities to the
> extent that the individual's alleged functional limitations and restrictions due to
> symptoms can reasonably be accepted as consistent with the objective medical
> evidence and other evidence in the case record."

SSR 96-7P, 1996 WL 374186,*2.

The applicable regulations recognize that a claimant's "symptoms can sometimes

suggest a greater level of severity than can be shown by the objective medical evidence alone."

SSR 96–7p, 1996 WL 374186, *3. When the objective evidence alone does not substantiate the

intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light of the

following symptom-related factors: (1) claimant's daily activities; (2) location, duration,

frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4)

type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5)

other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve

symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§404.1529(c)(3) (I)-(vii); 416.929(c)(3)(I)-(vii).

Here, ALJ Weir determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision" (T. 18). ALJ Weir stated that "despite his testimony that he has a learning disability and that he is a slow reader" plaintiff acknowledged shoplifting a computer anti-virus program, which "combined with admitted use of a computer, suggests a greater intellectual capacity than he has alleged" (T. 22). Such a conclusion by ALJ Weir appears to contradict his own finding that plaintiff suffered from a learning disability which constituted a severe impairment (T. 14).

ALJ Weir also discredited plaintiff because he admitted that he had obtained prescriptions for benzodiazepines from two different doctors and tried to "justify his use of benzodiazepines by invoking vague, sweeping labels such as having 'anxiety' or 'insomnia'" (T. 22). The fact that plaintiff obtained prescriptions from two doctors for benzodiazepines may fairly be considered when weighing plaintiff's credibility, but should be weighed in light of the entire record. ALJ Weir's interpretation of plaintiff's conduct in attempting to "justify" his use of benzodiazepines ignores the fact that plaintiff's treating psychiatrist advised plaintiff to continue to take them and to tell the judge presiding over his shoplifting case that he needed them to function (T. 496).

ALJ Weir also discredited plaintiff because he initially stated that he did not have family or friends, but then admitted to having one cousin in California, interacting with an individual from People Inc., and that he desired to (but did not) join a radio controlled model

- 17 -

airplane club (T. 21). The record reflects that plaintiff's parents are dead, he has no siblings, and his aunts "will not return [his] phone calls" (T. 333). Read in context, plaintiff's testimony regarding the extent of his contact with friends and family (T. 44-46) does not suggest that he intended to mislead ALJ Weir as to his social life. Indeed, even as described by ALJ Weir, the record reflects that plaintiff is fairly isolated and has no support system (T. 333, 485).

I am recommending that this case be remanded to the Acting Commissioner for further consideration of the medical evidence from plaintiff's treating physicians. Upon remand, the Acting Commissioner should also reconsider plaintiff's testimony regarding the limiting effects of his impairments in light of the entire record.

## CONCLUSION

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [10] be granted to the extent that this case should be remanded to the Acting Commissioner for further proceedings consistent with this Report and Recommendation and that the Acting Commissioner's motion for judgement on the pleadings [17] be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 31, 2017. Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

        The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: May 17, 2017

                    <u>/s/ Jeremiah J. McCarthy</u>
                    JEREMIAH J. MCCARTHY
                    United States Magistrate Judge